UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>-against-<br><br>RAFAEL SANTOS,<br><br>                    Defendant. | 88 Cr. 642 (LAP)<br><br><br><br>ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

  Before the Court is Defendant Rafael Santos' amended motion for compassionate release based on COVID-19.  (See Amended Motion for Compassionate Release ("Mot."), dated Nov. 30, 2020 [dkt. no. 259]).  For the reasons set out below, the motion is denied.[1]

I. Background

  In September 1988, in connection with an investigation of a cocaine trafficking organization located in upper Manhattan, the DEA worked with two confidential sources and identified supply-level drug dealers Rafael Romero and Albert Rodriguez.  (See Letter from Matthew J.C. Hellman, dated Oct. 5, 2020 ("Opp.") [dkt. no. 252] (citing Ex. C to Opp., Presentence Investigation

---

[1] Defendant filed his original motion on September 3, 2020 (Pro Se Motion to Reduce Sentence ("Orig. Mot."), dated Sept. 3, 2020 [dkt. no. 247]).  He thereafter asked to amend his submission, (Motion to Amend, dated Oct. 16, 2020 [dkt. no. 253]), and the instant amended motion was filed on December 8, 2020.

Report ("PSR") [dkt. no. 252-3] ¶¶ 6, 9, 10.1.)  Romero and Rodriguez had agreed to sell two kilograms of cocaine to the sources.  (PSR ¶¶ 6, 8.)  On September 6, 1988, Romero introduced the sources to Rodriguez, who told the sources the transaction would occur in his apartment.  (Id. ¶ 9.)  Inside the apartment, from where the sources were standing in the living room, they observed another unidentified man at a table with plastic bags and a scale in a back room, and the sources discussed the planned transaction with Romero while Rodriguez left to acquire the cocaine.  (Id. ¶¶ 10, 11.)  Romero explained he had history working with Rodriguez selling drugs and promised additional kilos of cocaine would be available if this deal went successfully.  (Id.)  When Rodriguez returned, Rodriguez accused one of the sources of working with law enforcement, but the deal went ahead.  (Id. ¶ 12.)  Romero and Rodriguez spoke with the unidentified man at the table in the back room, and Rodriguez returned to the living room with a kilogram of cocaine.  (Id.)  The sources covertly alerted DEA agents that the deal had gone down.

    DEA agents approached the apartment building and made their way to the landing outside the apartment. (Id. ¶ 13.)  As they set up outside the door to the apartment with their DEA shields displayed, the door opened and Romero stepped outside.  (Id.)  The DEA agents yelled, "Police, Policia, stop" while attempting

to detain Romero.  Romero was passed to Special Agent Bruce Travers and other agents, but Romero managed to run from the building, where he was later apprehended by additional agents stationed outside.  (Id. ¶ 14.)  Meanwhile, Rodriguez, who could see and hear the Romero arrest from his position inside the apartment, tossed the kilogram of cocaine in his hands to the floor and ran down an apartment hallway as agents entered the apartment while they continued to identify themselves as law enforcement.  (Id.) While three agents pursued Rodriguez, others, including Travers, conducted a protective sweep of the apartment for additional occupants.  (Id.)

Travers could hear the other agents struggling with Rodriguez, continuing to yell that they were police.  (See Ex. D to Opp., Testimony of Bruce Travers, Trial Transcript ("Tr.") [dkt. no. 252-4], at 635-36.)  Travers noticed a hallway closet and opened the door; he saw only clothes hanging in darkness, and after he began to close the door he reopened it to feel inside.  (Id. at 636)  As he did so, Travers recognized that the clothes he had seen were not hanging but were in fact worn by a person hidden in the closet. (Id.)  The moment Travers realized he could see a human form, he saw "a bright flaming flash coming from directly in front of the form, simultaneously with [a loud bang]."  (Id. at 636-37.)  Travers remained conscious as he realized he had been seriously wounded and was bleeding

3

profusely from his face.  As he held his hand to the right side of his face, Travers attempted to speak to his fellow agents, but found he could not speak.  (Id. at 638.)  Travers crawled behind a fellow agent until the gunfire stopped.  (Id. at 639.)

Meanwhile, other agents could observe that the person who had opened fire from the closet, Mr. Santos, had repositioned himself, and as he held the firearm with both hands extended from the door of the closet continued to fire over where Travers's body had fallen.  (PSR ¶ 17.)  At least one agent fired his weapon at Santos while he could see that Santos continued to fire, until Santos was also struck and pitched forward from his location inside the closet.  (Id. ¶ 18.) Agents searched Santos and found his weapon, which was a defaced .357 "Trooper" magnum revolver with six spent shell casings in the cylinder, along with a nylon shoulder holster.  (Id. ¶¶ 1, 15, 19.)  A subsequent search of the apartment revealed additional ammunition which was capable of being fired from Santos's revolver in the kitchen of the apartment, along with drug records, scales, packaging materials, and a modest additional quantity of cocaine.  (Id. ¶ 23.)  During the shootout, Santos had also struck one of the sources--the bullet entered the source's left bicep below his shoulder and exited from the middle of his back.  (Id. ¶ 20.)  The source survived his injuries after a brief hospitalization.  Santos was struck

4

in the leg and in the hand by the agent's return fire and also was hospitalized.  (Id. ¶ 21.)

Defendant was arrested at the scene on September 6, 1988. (Opp. at 4.)  This case represented Santos's first arrest in the United States; he had illegally entered the country from the Dominican Republic a short time before this incident.  (PSR ¶ 50.)  The Government charged Santos with seven counts relating to a large-scale drug trafficking conspiracy.  (Opp. at 4.) Count One of the Indictment charged Santos with conspiring to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846.  (Id.)  Count Two charged Santos with possessing approximately one kilogram of cocaine with the intent to distribute it, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B).  (Id.)  Count Three charged Santos with the use of a .357 Magnum revolver during the course of a narcotics trafficking offense, in violation of 18 U.S.C. § 924(c).  (Id.) Count Four charged Santos with assaulting a federal officer, a Special Agent with the Drug Enforcement Administration, and doing so with a deadly weapon in violation of 18 U.S.C. § 111. (Id. at 4-5.)  Count Five charged Santos with conspiring to murder a federal officer, in violation of 18 U.S.C. § 1117. (Id. at 5.)  Count Six charged Santos with the attempted murder of a federal officer, in violation of 18 U.S.C. §§ 1111, 1114, and 2.  (Id.)  Count Seven charged Santos with the receipt and

5

possession of a firearm with a defaced serial number, in violation of 26 U.S.C. §§ 5861(h) and 5871.  (PSR at 1.)

On March 14, 1989, following a jury trial in the United States District Court for the Southern District of New York before the Honorable Robert J. Ward, United States District Judge, Santos was convicted of all seven charges.  He was sentenced on May 25, 1989 to life imprisonment on each of the conspiracy charges; twenty years for attempted murder; ten years each for the assault and the possession charges; a consecutive sentence of five years for use of a firearm; and a concurrent sentence of five years' imprisonment for possession of the defaced firearm.  (See Ex. E to Opp., Sentencing Transcript ("Sent. Tr."), dated May 25, 1989 [dkt. no. 252-5], at 84-86.)

On January 9, 2020, Mr. Santos sought compassionate release from the Warden of FCI Allenwood.  In his request, Defendant cited medical conditions including (i) hypertension; (ii) prior operations involving his back; (iii) arthritis; (iv) prior wheelchair use; (v) chronic pain; (vi) dizziness and imbalance; and (vii) cognitive decline.  (See Ex. A to Opp., Petition for Compassionate Release, dated Jan. 9, 2020 [dkt. no. 252-1], at 3).  On or about February 18, 2020, the Warden of FCI Allenwood replied, denying Mr. Santos' request.  (See Ex. B to Opp., Inmate Request to Staff Response, dated Feb. 18, 2020 [dkt. no. 252-2].)

II. Applicable Law

A court normally may not modify a term of imprisonment once it has been imposed, but "compassionate release" is among the limited exceptions. United States v. Demaria, No. 17 CR. 569 (ER), 2020 WL 1888910, at *2-3 (S.D.N.Y. Apr. 16, 2020). Compassionate release allows a court to reduce a term of imprisonment where, among other things, "after considering the factors set forth in section 3553(a)," "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A).

Compassionate release considerations are guided by the policy statement within U.S. Sentencing Guidelines § 1B1.13. See 18 U.S.C. § 3582(c)(1)(A). Under Note 1 to U.S.S.G. § 1B1.13, extraordinary and compelling reasons exist based on the medical condition of the defendant where the defendant is "(i) suffering from a terminal illness," or "(I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (II) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Application Note 1, U.S.S.G. § 1B1.13.

Moreover, U.S.S.G. § 1B1.13 provides that, to grant compassionate release, the Court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.

It is a defendant's burden to prove that "extraordinary and compelling reasons" exist; that he is not a danger to the community; and that the Section 3553(a) factors and all other relevant considerations warrant the Court exercising its discretion to grant early release.  See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992); see also United States v. Israel, 05 CR 1039 (CM), 2020 WL 5641187, at *3 (S.D.N.Y. Sept. 22, 2020).

   III. Discussion

The Court assumes without deciding that it may decide Defendant's motion despite the fact that, as he admits, (see Mot. at 11), he has failed to exhaust his administrative remedies.

First, Defendant has not demonstrated "extraordinary and compelling circumstances warranting release" within the meaning of section 3582(c).  He is 59 years old and complains of "(1) hypertension, (2) cholesterol, (3) diabetes, (4) feel[ing] weak and suffer[ing] tremors, (5) experiencin[g] difficulty in breathing, (6) dizziness, (7) stomach aches, and (8) post

8

concussion syndrome." (Orig. Mot. at 12.) In his amended motion, Defendant complains of "immuno compromise, diabetes, hypertension, high cholesterol" and notes that he has had four back surgeries, is scheduled for a fifth, and spends most of his time in a wheelchair. (Mot. at 7.) Although type 2 diabetes is a malady that the CDC recognizes as posing particular risks for COVID-19 patients, Defendant does not suggest that the BOP has not treated all of his conditions, including his diabetes, appropriately. Indeed, the voluminous health records attached to the Government's papers, (see Exs. H, I, J to Opp.) demonstrate that the BOP has carefully attended to all of Defendant's conditions by, among other measures, regular therapy, adjustment of daily medication, monitoring of diet, commissary use, exercise, and workshops to encourage healthy habits. These measures have been successful in keeping Defendant's blood pressure below hypertensive ranges and his diabetes in check.

The records also demonstrate careful attention to Defendant's balance and back issues, including multiple procedures to address his chronic back pain and extensive physical therapy to manage his mobility issues and his pain. Indeed, although the doctors note that Defendant will experience some degree of pain regardless of medical intervention, contrary to Defendant's representation (Mot. at 7), his therapy removed

his need for a wheelchair and helped with pain management.  In sum, Defendant does not suggest that the BOP is not addressing his maladies or that he cannot care for himself in the institutional setting.  And, at 59, his age does not place him in the group the CDC recognizes as more likely to suffer a severe case of COVID-19.  Accordingly, the Defendant has not complied with the first requirement of section 3582(c).  See United States v. Romero, No. 17-CR-123 (LAP), 2020 WL 5578272, at *2 (S.D.N.Y. Sept. 16, 2020) (finding defendant did not demonstrate "extraordinary and compelling circumstances" warranting release by the fact of his "well-controlled" diabetes).

Even if these ailments as Mr. Santos describes them could constitute "extraordinary and compelling circumstances warranting release" under § 3582(c), that only answers "[t]he threshold question." United States v. Daugerdas, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020) (Pauley, J.)  The Court must also consider the factors set out in § 3553(a).  These factors weigh heavily against release.

As set out at length in the Government's papers (Opp. at 9-10), Defendant asserts that he has taken responsibility for his crimes (see Orig. Mot at 8-9), but as recently as a filing in 2019, he insisted that he could make "a clear showing of actual innocence."  (See, e.g., Motion for Relief from Judgment

10

Pursuant to Fed. R. Civ. P. 60(b)(6), dated Jan. 7, 2019 [dkt. no. 218], at 1.)  On the other hand, Defendant "does not deny the 'factual guilt' found in his conviction" (Orig. Mot. at 8) and claims to experience "deep felt remorse" for his actions, (id. at 9).  As the Government notes, however, this is consistent with Defendant's position at trial; he never denied the shootings or that he was the shooter but never admitted his participation in the narcotics conspiracy or that he had intentionally shot a law enforcement officer.  See, e.g., PSR at ¶ 21 ("[S]ome friends asked him to come to an apartment for a business transaction, gave him a gun, and told him to hide in the closet and in the event of trouble, to shoot.").  As the Government points out:

> The record evidence demonstrates that Santos was absolutely aware of the reality of his situation; he could not possibly have been oblivious to the narcotics paraphernalia or ammunition around the apartment, the conversations taking place outside his door, the comings and goings of the dealers, the numerous DEA agents repeatedly shouting as they announced themselves as police, the sounds of the struggles outside as law enforcement attempted to gain control of the situation, or the elemental fact that hiding in a closet with an illegal firearm with instructions to shoot at the first sign of trouble is not a legitimate aspect of any business anywhere in the world, much less a New York City apartment.

(Opp. at 10.)

Even Defendant's most recent discussion of his crimes is from fantasyland: in his motion, he compares his conduct to that

11

of "white-collar criminals," clearly a disconnect.  (Orig. Mot. at 9.) On this record, the Court cannot find that Defendant has accepted responsibility for his crimes.

Defendant also asserts that he has been a "model inmate," (Orig. Mot. at 13), that he is not a danger to the community, (id. at 8), and that he has been significantly rehabilitated, (id. at 13).  The record does not bear him out, however. Defendant has not earned his GED, and he has taken only five classes in the last decade; most of the rest were over twenty years ago.  (See Ex. F to Opp., Inmate Educational Data, dated Sept. 15, 2020 [dkt. no. 252-6].)  Indeed, he has not been enrolled in any classes since 2018.  (Id.)  While Defendant's disciplinary record is not the worst the Court has ever seen, with seven infractions over the period of his incarceration, (see Ex. G to Opp., Disciplinary History [dkt. no. 252-7]), it is far from the best.  Indeed, when compared to, for example, Eric Millan, a defendant to whom the Court granted compassionate release, this Defendant does not come close to being a model prisoner.  See United States v. Millan, No. 91-CR-685 (LAP), 2020 WL 1674058, at *10-15 (S.D.N.Y. Apr. 6, 2020) (recounting that defendant demonstrated decades of self-improvement through education and employment, efforts at mentorship, total embrace and disavowal of the conduct leading to conviction, vast support from BOP staff, educators, and those who knew him best and had

12

benefited from his good works). On this record, the Court cannot find that Defendant has been a "model prisoner" or has been rehabilitated.

Finally, and most importantly, the wantonness of Defendant's crime and his lack of remorse convince the Court that continued incarceration is required to punish Defendant for his crimes and to protect the public from further crimes. As the Government has noted, Defendant, who was hiding in a closet, fired his defaced .357 "Trooper" magnum revolver when Agent Travers opened the door to the closet, striking the agent in the face at point blank range. After Agent Travers fell to the ground, Defendant repositioned himself and continued to fire over Agent Travers' body at the other agents and sources in the apartment, striking one of the DEA sources. Eventually, agents returned fire and felled Defendant, but only after he had fired every round in his revolver.

That Defendant's fusillade did not result in the death of someone in the apartment is only dumb luck. As Judge Ward noted at sentencing, these defendants "came within millimeters of taking a human life." (See Sent. Tr. at 83.) In particular, he explained that "sentences here must demonstrate that assaults, the attempted murder, the actual murder in other situations, of law enforcement officials will not be tolerated by the courts." (Id. at 84.)

Not surprisingly, Agent Travers' injuries were catastrophic.  As Agent Travers explained at trial, "the bullet . . . shattered my right cheekbone, fractured my eye socket in 4 [places], fractured my nasal bone, traveled down through my mouth, shattering my upper right jaw, fracturing my lower jaw in 8 places and exited through my neck."  See Tr. at 642.  Agent Travers lost a third of his teeth, a half inch from his tongue which had been severed, and was left with a hole in the roof of his mouth reaching his nasal cavity, and multiple metal plates and bars were inserted in an effort to rebuild his facial fractures.  (Id.)  The Government summarized the life-altering medical consequences to Agent Travers from his injuries:

> Travers's injuries resulted in over a year and a half convalescence and fourteen surgeries over the course of three years. Even after these surgeries, which including painful bone grafts and the permanent insertion of numerous metal plates, screws, bolts, and other joints, Travers still requires prosthetic devices to maintain the shape of his face. He inserts these prostheses each morning and removes them before sleep every night. Alongside at a minimum annual check-ins with his medical team, Travers suffers from chronic sinus infections which are of themselves inordinately dangerous. Because his sinuses were effectively destroyed during the shooting, and now cannot properly drain, Travers experiences frequent infections which are difficult to treat and pose outsized threats to his health. These same conditions make it impossible for Travers to breathe at night unless he sleeps in one specific position on his side; any other position will cause him to stop breathing. The right side of Travers's face is numb to the touch, and his face and neck bear deep scars from the shooting, his emergency tracheotomy, and the various reconstructive surgeries that were required to repair the damage caused by the shooting. In sum, to

> this day Travers bears the scars and suffers daily the consequences of his brush with the defendant.

(Opp. at 14.)

Defendant's willingness to shoot and continue shooting until he emptied his weapon, without regard to human life and inflicting untold suffering on Agent Travers, is deserving of the harshest sentence.[2]  To release this remorseless Defendant, at age 59, from a richly-deserved life sentence would be a severe affront to the sentencing objectives of imposing a sentence that reflects the seriousness of the offense, promoting respect for the law, and providing just punishment for the offense.  Given the wantonness of the crime, the total disregard for human life that it betokens, and the Defendant's lack of remorse, releasing this Defendant would also pose a danger to his community.  The § 3553(a) factors weigh heavily and decisively against release.

IV. Conclusion

For the reasons set out above, Defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c), (dkt. no. 129), as supplemented, (dkt. no. 137), is denied.  The Clerk of the Court shall mail a copy of this order to the Defendant.

**SO ORDERED.**

---

[2] The Court notes that Defendant's co-defendants, who did not pull the trigger, are also serving life sentences.  To release this Defendant, who did pull the trigger, would constitute an unconscionable sentencing disparity.

15

Dated:      New York, New York
            February 25, 2021

_____
LORETTA A. PRESKA
Senior United States District Judge

16