UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -against- | 88 CR 642 (LAP) |
| RAFAEL SANTOS, | ORDER |
| Defendant. | |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Rafael Santos' counseled motion for reconsideration (dkt. no. 271) of the Court's denial (dkt. no. 267) of his pro se amended motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) (dkt. no. 259). For the reasons set out below, the motion is granted in that the Court reconsiders its original decision, but, upon reconsideration, adheres to its denial of Defendant's motion for compassionate release.

### I. Background

The Court assumes familiarity with the underlying motion for compassionate release and will not repeat the details except as necessary to explain its decision.

### II. Discussion

Anthony L. Ricco, Esq., Defendant's counsel on the reconsideration motion, has presented a thoughtful, empathetic, and gracious argument on behalf of his client.  Counsel has provided additional information and argument regarding the state

1

of Mr. Santos' health and has argued that the Court applied the wrong legal standard in finding that Mr. Santos' health conditions do not present "extraordinary and compelling circumstances warranting release." For the purposes of this motion, the Court accepts, without deciding, that Mr. Santos' health condition, in combination with the COVID-19 pandemic, presents "extraordinary and compelling circumstances warranting release."

However, as the late Judge William H. Pauley III noted in United States v. Daugerdas, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020), a finding of extraordinary and compelling circumstances only answers "[t]he threshold question." The Court must also consider the factors set out in section 3553(a). There, counsel's eloquence cannot help Mr. Santos escape the facts he created; the § 3553(a) factors weigh heavily against release.

First, Defendant's crimes of conviction were exceptionally serious. In addition to conspiring to and actually distributing multiple kilos of cocaine, Defendant was convicted of, inter alia, conspiring to and attempting to murder a federal officer, using a firearm in connection of a narcotics offense, and possessing a defaced firearm.

Defendant's shooting of the DEA agent was particularly wanton. The Defendant was hiding in a closet when the agents

2

entered the apartment where the drug transaction was taking place. Upon entering and throughout the episode, the agents loudly shouted "police." As part of a security sweep, DEA Agent Bruce Travers opened the closet, started to close it, and then reopened it to feel the clothes he thought were hanging there. As the Court noted in denying Defendant's original motion:

> Defendant, who was hiding in a closet, fired his defaced .357 "Trooper" magnum revolver when Agent Travers opened the door to the closet, striking the agent in the face at point blank range. After Agent Travers fell to the ground, Defendant repositioned himself and continued to fire over Agent Travers' body at the other agents and sources in the apartment, striking one of the DEA sources. Eventually, agents returned fire and felled Defendant, but only after he had fired every round in his revolver. That Defendant's fusillade did not result in the death of someone in the apartment is only dumb luck. As Judge Ward noted at sentencing, these defendants "came within millimeters of taking a human life." (See Sent. Tr. at 83.) In particular, he explained that "sentences here must demonstrate that assaults, the attempted murder, the actual murder in other situations, of law enforcement officials will not be tolerated by the courts." (Id. at 84.)

(Dkt. no. 267 at 13.)

As part of his argument about his exceptional and compelling circumstances, Defendant cites, inter alia, his chronic back pain and his general confinement to a wheelchair.[1]

---

[1] Defendant's medical records demonstrate that physical therapy has removed the need for him to use a wheelchair and has helped with pain management. (Dkt. no. 261 at 9-10).

3

In the underlying motion, the Court recites the horrific damage Defendant inflicted on Agent Travers:

> Not surprisingly, Agent Travers' injuries were catastrophic. As Agent Travers explained at trial, "the bullet . . . shattered my right cheekbone, fractured my eye socket in 4 [places], fractured my nasal bone, traveled down through my mouth, shattering my upper right jaw, fracturing my lower jaw in 8 places and exited through my neck." See Tr. at 642. Agent Travers lost a third of his teeth, a half inch from his tongue which had been severed, and was left with a hole in the roof of his mouth reaching his nasal cavity, and multiple metal plates and bars were inserted in an effort to rebuild his facial fractures. (Id.) The Government summarized the life-altering medical consequences to Agent Travers from his injuries:
>
>> Travers's injuries resulted in over a year and a half convalescence and fourteen surgeries over the course of three years. Even after these surgeries, which including painful bone grafts and the permanent insertion of numerous metal plates, screws, bolts, and other joints, Travers still requires prosthetic devices to maintain the shape of his face. He inserts these prostheses each morning and removes them before sleep every night. Alongside at a minimum annual check-ins with his medical team, Travers suffers from chronic sinus infections which are of themselves inordinately dangerous. Because his sinuses were effectively destroyed during the shooting, and now cannot properly drain, Travers experiences frequent infections which are difficult to treat and pose outsized threats to his health. These same conditions make it impossible for Travers to breathe at night unless he sleeps in one specific position on his side; any other position will cause him to stop breathing. The right side of Travers's face is numb to the touch, and his face and neck bear deep scars from the shooting, his emergency tracheotomy, and the various reconstructive surgeries that were required to repair the damage caused by the shooting. In sum, to this day Travers bears the scars and suffers daily the consequences of his brush with the defendant.

(Id. at 14-15.)  The Defendant's maladies pale in comparison to Agent Travers' and demonstrate the need for the harshest punishment.

With respect to any remorse, counsel notes:

> This court is quite accurate to point out that over the years, Rafael Santos has filed a proliferation of pro se applications and has burdened this court and other courts, along with various institutional investigative agencies, with attempts to gain his release based upon past assertions of (1) claims of actual innocence; (2) prosecutorial misconduct (lack of a proper investigation and the misapplication of the law) and the manipulation of evidence to secure a conviction against an innocent man; (3) the excessiveness and harshness of the sentence imposed; (4) inaccuracy of the ballistic evidence presented at trial; (5) the failure to conduct forensic examinations-such as gunshot residue tests; serology and DNA evaluations; (6) that his arrest and prosecution was the result of the conduct of corrupt subsequently convicted law enforcement officers, who committed perjury in order to secure a conviction. The court concludes that the continuous assertions in these pleadings reflect the absence of rehabilitation, remorse and redemption which is often viewed strongly in favor of a finding of extraordinary and compelling reasons for compassionate release.

(Dkt. no. 271 at 19 (footnote omitted).)

Counsel then writes eloquently about denial as "one of the most powerful human emotions and mechanisms that involves ignoring the reality of a situation to avoid anxiety" (id. at 20) and cites to Defendant's expressions of regret and remorse from a 2019 Petition for Commutation of a Sentence (id. at 25-26).  While also eloquent, Defendant's protestations are too little, too late.  His decades-long protestations of actual

5

innocence and his recent comparison of himself to a white collar criminal (dkt. no. 247 at 9) cast doubt on any expressions of regret or remorse.

As the Court noted in its original denial of Mr. Santos' motion:

> Defendant also asserts that he has been a "model inmate," (Orig. Mot. at 13), that he is not a danger to the community, (id. at 8), and that he has been significantly rehabilitated, (id. at 13). The record does not bear him out, however. Defendant has not earned his GED, and he has taken only five classes in the last decade; most of the rest were over twenty years ago. (See Ex. F to Opp., Inmate Educational Data, dated Sept. 15, 2020 [dkt. no. 252-6].) Indeed, he has not been enrolled in any classes since 2018. (Id.) While Defendant's disciplinary record is not the worst the Court has ever seen, with seven infractions over the period of his incarceration, (see Ex. G to Opp., Disciplinary History [dkt. no. 252-7]), it is far from the best. Indeed, when compared to, for example, Eric Millan, a defendant to whom the Court granted compassionate release, this Defendant does not come close to being a model prisoner. See United States v. Millan, No. 91-CR-685 (LAP), 2020 WL 1674058, at *10-15 (S.D.N.Y. Apr. 6, 2020) (recounting that defendant demonstrated decades of self-improvement through education and employment, efforts at mentorship, total embrace and disavowal of the conduct leading to conviction, vast support from BOP staff, educators, and those who knew him best and had benefited from his good works). On this record, the Court cannot find that Defendant has been a "model prisoner" or has been rehabilitated.

(Dkt. no. 261 at 12-13.)

Accordingly, the Court grants Mr. Santos' motion for reconsideration. Having reconsidered its denial of Mr.

6

Santos' original motion, the Court adheres to its prior conclusion that:

> Defendant's willingness to shoot and continue shooting until he emptied his weapon, without regard to human life and inflicting untold suffering on Agent Travers, is deserving of the harshest sentence.  To release this remorseless Defendant, at age 59, from a richly-deserved life sentence would be a severe affront to the sentencing objectives of imposing a sentence that reflects the seriousness of the offense, promoting respect for the law, and providing just punishment for the offense.  Given the wantonness of the crime, the total disregard for human life that it betokens, and the Defendant's lack of remorse, releasing this Defendant would also pose a danger to his community.  The § 3553(a) factors weigh heavily and decisively against release.

(Id. at 15.)

### III. Conclusion

For the reasons set out above, Defendant's motion to reconsider the Court's prior denial of his motion for compassionate release (dkt. no. 271) is granted in that the Court reconsiders its original decision, but, upon reconsideration, adheres to its denial of Defendant's motion for compassionate release.

The Clerk of Court shall close the motion. (Dkt. no. 271)

**SO ORDERED.**

Dated:   New York, New York
         February 11, 2022

_____
LORETTA A. PRESKA
Senior United States District Judge